RECORD NO. 13-1672

IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

UNITED STATES *EX REL.* MIKE AHUMADA,

Plaintiff - Appellant

and

ERIC H. HOLDER, JR., Attorney General

Plaintiff

v.

NISH; GREEN BAY PACKAGING INC.; INTERNATIONAL PAPER COMPANY; SMURFIT-STONE CONTAINER CORPORATION; WEYERHAEUSER COMPANY,

Defendants – Appellees

and

NATIONAL CENTER FOR EMPLOYMENT OF THE DISABLED (now known as ReadyOne Industries) and BOB JONES, a/k/a Robert E. Jones

Defendants

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA (Alexandria Division)
Civil Action No. 1:06-cv-713-CMH-TCB

### Response Brief of Appellees

Charles William McIntyre, Jr.
Franklin Darley Annand
MCGUIREWOODS, LLP
Suite 400
2001 K Street, NW
Washington, D.C. 20006-1040
Tel: (202) 857-1700

Seth A. Rosenthal
VENABLE, LLP
Terrell Place
575 7th Street, NW,
Washington, D.C. 20004
Tel: (202) 344-4000

August 22, 2013

Jeremy S. Byrum
Matthew A. Fitzgerald
MCGUIREWOODS, LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219
Tel: (804) 775-1000

John Francis Henault, Jr.
PERKINS COIE, LLP
Suite 600
700 13th Street, NW
Washington, D.C. 20005-2011
Tel: (202) 654-6200

Paul H. Trinchero
Robert C. Weaver, Jr.
Benjamin J. Lambiotte
GARVEY SCHUBERT BARER
121 SW Morrison Street, 11th Floor
Portland, Oregon 97204
Tel: (503) 228-3939

Michael Wayne Robinson
VENABLE, LLP
Suite 300
8010 Towers Crescent Drive
Tysons Corner, Virginia 22182
Tel: (703) 760-1600

Lynn F. Jacob
WILLIAMS MULLEN, P.C.
P.O. Box 1320
Richmond, Virginia 23218-1320
Tel: (804) 420-6000

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 13-672 _____    Caption: U.S. ex rel. Ahumada v. NISH _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

NISH _____
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
        (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

- 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
       If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑NO
       If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑NO
       If yes, identify any trustee and the members of any creditors' committee:

Signature: Seth Rosenthal _____    Date: _____ June 6, 2013 _____

Counsel for: NISH _____

## CERTIFICATE OF SERVICE
**************************

I certify that on _____ June 6, 2013 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____          _____
(signature)                                 (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __13-1672__        Caption: __U.S. ex rel. Mike Ahumada v. Green Bay Packaging, Inc. et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Green Bay Packaging, Inc.__
(name of party/amicus)

_____

who is _____Appellee_____, makes the following disclosure:
       (appellant/appellee/amicus)

1.   Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.   Does party/amicus have any parent corporations?                              ☐ YES ☑ NO
     If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                          ☐ YES ☑ NO
     If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?   ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Lynn F. Jacob _____        Date: ____ May 30, 2013 ____

Counsel for: Green Bay Packaging, Inc. _____

## CERTIFICATE OF SERVICE
**************************

I certify that on ____ 5/30/3013 ____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Lynn F. Jacob _____                    ____ May 30, 2013 ____
        (signature)                                          (date)

07/19/2012                          - 2 -
SCC

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. 13-1672        Caption: United States ex rel. Ahumada v. International Paper Company et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

International Paper Company
(name of party/amicus)

who is _____ appellee _____, makes the following disclosure:
        (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity? ☑YES ☐NO

2.    Does party/amicus have any parent corporations?                          ☐YES ☑NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                          ☐YES ☑NO
      If yes, identify all such owners:

- 1 -

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Charles Wm. McIntyre                    Date:      6/6/13

Counsel for: International Paper Company

## CERTIFICATE OF SERVICE
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I certify that on _____6/6/13_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Charles Wm. McIntyre                                   6/6/13
        (signature)                                        (date)

07/19/2012                        - 2 -
SCC

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __13-1672__    Caption: __U.S. ex rel Mike Ahumada v. NISH et alia__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Rocktenn CP, LLC, f/k/a Smurfit Stone Container Corporation__
(name of party/amicus)

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations? ☑ YES ☐ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
      Rock-Tenn Company, a publicly traded company

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☑ YES ☐ NO
      If yes, identify all such owners:
      Rock-Tenn Company

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
     If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Benjamin J. Lambiotte _____     Date: _____ 6/7/2013 _____

Counsel for: _____

## CERTIFICATE OF SERVICE
*****************************

I certify that on _____ 6/7/22013 _____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

/s/  Benjamin J. Lambiotte _____                    _____ 6/7/2013 _____
          (signature)                                              (date)

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
## DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __13-1672__    Caption: __United States ex rel. Ahumada v. Weyerhaeuser Company et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Weyerhaeuser Company__
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/amicus)

1.  Is party/amicus a publicly held corporation or other publicly held entity? ☑ YES ☐ NO

2.  Does party/amicus have any parent corporations? ☐ YES ☑ NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
    If yes, identify all such owners:

- 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Charles Wm. McIntyre                     Date:        6/6/13

Counsel for: Weyerhaeuser Company

## CERTIFICATE OF SERVICE
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I certify that on        6/6/13        the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Charles Wm. McIntyre                                        6/6/13
_____                    _____
(signature)                                                          (date)

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

ISSUES PRESENTED ...........................................................................................2

STATEMENT OF THE CASE...............................................................................2

STATEMENT OF THE FACTS ............................................................................5

SUMMARY OF THE ARGUMENT ...................................................................11

ARGUMENT .......................................................................................................14

I.    THE DISTRICT COURT CORRECTLY FOUND THAT THE
      FCA'S PUBLIC DISCLOSURE BAR DEPRIVED IT OF
      JURISDICTION TO ADJUDICATE AHUMADA'S CLAIMS
      AGAINST THE REMAINING DEFENDANTS ........................................14

      A. The District Court Properly Found that Ahumada's Allegations
         Were Based Upon Publicly Disclosed Information ................................16

         1. Manufacturing Defendants.................................................................18

         2. NISH ...................................................................................................19

            a.  NISH's compliance reviews.........................................................20

            b.  404 Forms....................................................................................22

            c.  NISH's purported conflict of interest...........................................24

      B. The District Court Correctly Found That Ahumada Was Not An
         "Original Source." .................................................................................26

         1. Manufacturing Defendants—Green Bay and Smurfit Stone .............30

         2. NISH ...................................................................................................31

II.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN
      DENYING LEAVE TO AMEND ON FUTILITY GROUNDS
      BECAUSE THE SECOND AMENDED COMPLAINT REMAINED
      DEFICIENT UNDER RULES 9(b) AND 12(b)(6). ..................................34

      A. The Applicable Law Is the 2006 Version of the FCA ...........................34

      B. The Second Amended Complaint Fails to Meet the Particularity
         Requirements of Rule 9(b) .....................................................................36

         1. Ahumada failed to plead a single false claim submitted to the
            government ..........................................................................................37

TABLE OF CONTENTS
(continued)

2.  Ahumada failed to allege any other particulars, instead claiming nothing more than a theory of fraud in search of facts that would improperly depend on discovery to develop ...........................40

C.  The Second Amended Complaint Cannot Survive Rule 12(b)(6) ..........46

1.  Ahumada failed to plead the element of materiality for any claim or against any defendant............................................................46

a.  Even if the Fourth Circuit would recognize an implied certification theory of liability under the FCA, Ahumada never alleged that payments from the government were conditioned on certifying JWOD compliance................................47

b.  Compliance with the direct labor requirement was not, in fact, a condition of payment...........................................49

2.  Ahumada failed to plausibly allege scienter for any count against any of the Manufacturing Defendants ...................................50

a.  It is wildly implausible that any manufacturer could have pieced together NCED's fraud simply by selling products to NCED ........................................................................51

b.  Ahumada cannot plausibly allege scienter based on what he told the Manufacturing Defendants.................................52

c.  Ahumada cannot plausibly allege scienter based on tours of NCED .........................................................................54

d.  Ahumada cannot plausibly allege scienter based on box stamps and rebates.......................................................55

3.  Ahumada failed to plausibly plead the elements of a conspiracy against any remaining defendant (Count III) .....................................57

4.  Ahumada has abandoned his "reverse" false claim count in Count IV ...........................................................................59

CONCLUSION.................................................................................60

CERTIFICATE OF COMPLIANCE....................................................63

CERTIFICATE OF SERVICE ............................................................64

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*Allison Engine Co. v. United States ex rel. Sanders*,
553 U.S. 662 (2008)..............................................................14, 56, 57

*Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.*,
190 F.3d 729 (6th Cir. 1999) ...........................................................59

*Apple v. Prudential-Bache Sec., Inc.*,
820 F. Supp. 984 (W.D.N.C. 1992)..................................................41

*Arnlund v. Smith*,
210 F.Supp.2d 755 (E.D. Va. 2002) .................................................42

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................45

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).................................................3, 13, 45, 56, 58

*Graham County Soil and Water Conservation District v.*
*United States ex rel. Wilson*, 559 U.S. 280 (2010)............................14

*Grayson v. Advanced Mgmt. Tech., Inc.*,
221 F.3d 580 (4th Cir. 2000) ..........................................15, 25, 28, 31

*Harrison v. Westinghouse Savannah River Co.*,
176 F.3d 776 (4th Cir. 1999) ..........................................36, 46, 47, 48

*Hays v. Hoffman*,
325 F.3d 982 (8th Cir. 2003) ...........................................................28

*Juntti v. Prudential-Bache Sec., Inc.*,
993 F.2d 228 (4th Cir. 1993) ...........................................................42

*Mayfield v. NASCAR*,
674 F.3d 369 (4th Cir. 2012) ...........................................................58

*Rockwell Int'l Corp. v. United States*,
549 U.S. 457 (2007)..........................................14, 15, 16, 29, 30

*Sanders v. Allison Engine Co.,*
  703 F.3d 930 (6th Cir. 2012) ...............................................................35

*United States ex rel. Ackley v. IBM Corp.,*
  76 F. Supp. 2d 654 (D. Md. 1999)........................................................16

*United States ex rel. Boothe v. Sun Healthcare Grp., Inc.,*
  496 F.3d 1169 (10th Cir. 2007) ...........................................................16

*United States ex rel. Carter v. Halliburton Co.,*
  2009 WL 2240331 (E.D. Va. July 23, 2009).......................................47

*United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.,*
  543 F.3d 1211 (10th Cir. 2008) ...........................................................49

*United States ex rel. Davis v. Prince,*
  753 F. Supp. 2d 569 (E.D. Va. 2011) .......................................27, 32, 33

*United States ex rel. Detrick v. Daniel F. Young, Inc.,*
  909 F. Supp. 1010 (E.D. Va. 1995) ......................................................27

*United States ex rel. Elms v. Accenture LLP,*
  341 F. App'x 869 (4th Cir. 2009)...................................................40, 41

*United States ex rel. Godfrey v. KBR,*
  360 F. App'x 407 (4th Cir. 2011) .................................39, 41, 44, 45

*United States ex rel. Hafter D.O. v. Spectrum Emergency*
  *Care, Inc.,* 190 F.3d 1156 (10th Cir. 1999) ...........................26, 31, 32

*United States ex rel. Harrison v. Westinghouse*
  *Savannah River Co.,* 352 F.3d 908 (4th Cir. 2003)...........................50

*United States ex rel. Hererra v. Danka Office Imaging Co.,*
  91 F. App'x 862 (4th Cir. 2004)...........................................................48

*United States ex rel. Karvelas v. Melrose-Wakefield Hosp.,*
  360 F.3d 220 (1st Cir. 2004)................................................................37

*United States ex rel. Mikes v. Straus,*
  274 F.3d 687 (2d Cir. 2001) ..........................................................47, 49

iv

*United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*,
   707 F.3d 451 (4th Cir. 2013) ........................................................passim

*United States ex rel. Owens v. First Kuwaiti Gen.*
   *Trading & Contracting Co.*, 612 F.3d 724 (4th Cir. 2010) ...............................50

*United States ex rel. Quinn v. Omnicare, Inc.*,
   382 F3d 432, 443 (3d Cir. 2004) ........................................................47

*United States ex rel. Siewick v. Jamieson Sci.*
   *& Eng'g, Inc.,* 241 F.3d 1372 (D.C. Cir. 2000) ...................................47

*United States ex rel. Sikkenga v. Regence*
   *Bluecross Blueshield*, 472 F.3d 702 (10th Cir. 2006) ........................................37

*United States ex rel. Siller v. Becton Dickinson & Co.*,
   21 F.3d 1339 (4th Cir. 1994) ........................................................15, 16

*United States ex rel. Stinson, Lyons, Gerlin &*
   *Bustamante, P.A. v. Prudential Ins. Co.*,
   944 F.2d 1149 (3d Cir. 1991) ........................................................28, 29

*United States ex rel. Vigil v. Nelnet, Inc.*,
   639 F.3d 791 (8th Cir. 2011) ........................................................49, 57

*United States ex rel. Vuyyuru v. Jadhav*,
   555 F.3d 337 (4th Cir. 2009) ........................................................passim

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
   525 F.3d 370 (4th Cir. 2008) ........................................................33, 36, 39

**STATUTES**

31 U.S.C. § 3729(a)(1) (2006) ........................................................3, 35

31 U.S.C. §§ 3729(a)(2) (2006) ........................................................3, 35

31 U.S.C. §§ 3729(a)(3) (2006) ........................................................35

31 U.S.C. §§ 3729(a)(7) (2006) ........................................................3, 35, 59

31 U.S.C. § 3729(b) (2006) ........................................................35, 50

31 U.S.C. § 3729(a)(1)(A) (2009) ...................................................35

31 U.S.C. § 3729(a)(1)(B) (2009) ...................................................35

31 U.S.C. § 3729(a)(1)(C) (2009) ...................................................35

31 U.S.C. § 3729(a)(1)(G) (2009) ...................................................35

31 U.S.C. § 3730(e)(4) .....................................................3, 15, 26

31 U.S.C. § 3730(e)(4)(A) (2006) ..................................................14

31 U.S.C. § 3730(e)(4)(B) (2006) ..............................................15, 26

41 U.S.C. § 47 (2006) ...................................................................6

41 U.S.C. § 48 (2006) ...................................................................6

41 U.S.C. § 48b(4)(C) (2006) ...............................6, 49, 51, 53

41 U.S.C. § 8501(8) ...........................................................54, 55

**OTHER AUTHORITIES**

41 C.F.R. § 51-1.1(a) (2006) .................6, 7, 49, 50, 51, 53

48 C.F.R. § 15.403 ......................................................................56

Fed. R. App. P. 28(a)(9)(A) .........................................................59

Pub. L. No. 111-21, § 4(f) .............................................35, 36, 58

Rule 9(b) .........................................................................passim

Rule 12(b)(1) ...............................................................3, 15

Rule 12(b)(6) ..................................................................passim

U.S. Gov't Accountability Office, GAO-07-236,
    *Federal Disability Assistance: Stronger Federal
    Oversight Could Help Assure Multiple Programs'
    Accountability* (2007) ..............................................26

## INTRODUCTION

*Qui tam* relator Mike Ahumada worked at NCED for less than six months in early 2004.  Nearly two years later—months after news stories began to appear about large-scale fraud at NCED—Ahumada filed a *qui tam* action against NCED and its president.  Another year later, after significantly more information became public, Ahumada amended his Complaint to add the current defendants:  NISH, Green Bay Packing Co., International Paper Co., Smurfit Stone Container Corp., and Weyerhaeuser Co.  The government eventually obtained criminal convictions against NCED executives as well as a $5 million settlement from NCED under the False Claims Act in this case.  The government, however, specifically refused to intervene against the current defendants.

The District Court correctly dismissed Ahumada's claims against these afterthought defendants on multiple grounds: lack of jurisdiction under the public disclosure bar (because the allegations were obviously copied from news and other sources and were so generalized that they did not support Ahumada's claim of being an original source); failure to plead fraud with specificity under Rule 9(b); and failure to plead a plausible case under Rule 12(b)(6), in part for lack of pleading necessary elements.  Ahumada attempted to cure these deficiencies by seeking leave to file a Second Amended Complaint, but the District Court

recognized that even once alerted to the multiple fatal flaws in his Complaint, Ahumada was unable to cure them, and denied leave to amend as futile.

## ISSUES PRESENTED

1.     Did the District Court properly rule that the public disclosure bar eliminated subject matter jurisdiction over this lawsuit?

2.     Did the District Court abuse its discretion by denying Ahumada's motion for leave to amend on the grounds that his proposed Second Amended Complaint failed to cure the pleading deficiencies in his First Amended Complaint?

## STATEMENT OF THE CASE

Ahumada filed this action in the Eastern District of Virginia on June 20, 2006.  His Complaint, filed on behalf of the United States and under seal, alleged that Ahumada's former employer, NCED, and its president, Bob Jones, submitted false claims for payment while performing under government contracts.  The Complaint's five counts claimed violations of the False Claims Act ("FCA"), including filing false claims for payment, conspiracy, and retaliation.  *See* 31 U.S.C. § 3729, *et seq*.  JA 17-18.  The gist of the Complaint was that NCED received payments from the government under lucrative no-bid contracts by falsely implying it used severely disabled employees to perform most of its labor.

On June 29, 2007, Ahumada filed a First Amended Complaint, to which he added the following defendants:  NISH, Green Bay, International Paper, Smurfit

2

Stone, and Weyerhaeuser.[1]   JA 49.  The First Amended Complaint alleged, as relevant, violations of 31 U.S.C. §§ 3729(a)(1) and (a)(2) (presenting and making or causing false claims), § 3729(a)(3) (conspiracy), and § 3729(a)(7) (reverse false claim).  JA 73-75.

Between 2006 and 2012, the lawsuit remained under seal as the government built criminal cases against several NCED executives, including President Bob Jones and Chief Operating Officer Ernesto Lopez, and ultimately obtained convictions.[2]  Eventually, in September 2012, the government elected to intervene against NCED and Bob Jones, and immediately settled its claims for $5 million. *United States ex rel. Ahumada v. NCED*, Civ. A. No. 1:06-cv-713, Dkt. 86 (hereinafter Dist. Ct. Dkt.).  The government expressly declined to intervene against the remaining defendants, and the court ordered the First Amended Complaint unsealed and served on them.  Dist. Ct. Dkt. 87.

In January 2013, the remaining defendants moved to dismiss the First Amended Complaint under Rule 12(b)(1) and 12(b)(6).  The combined motions made two primary arguments: (1) the District Court lacked jurisdiction under the FCA's public disclosure bar, 31 U.S.C. § 3730(e)(4), because Ahumada's

---

[1] Smurfit Stone Container Corporation is now known as RockTenn CP, LLC. Consistent with the allegations in Ahumada's pleadings, this brief refers to "Smurfit Stone."

[2] Employees of each of the current defendants were witnesses for the government against Lopez at his trial.

3

allegations were based on publicly-disclosed information for which he was not the original source; and (2) the First Amended Complaint failed to plead each element of the claims, failed to plead plausibly under *Twombly-Iqbal*, and grossly failed to plead with particularity under Rule 9(b).  In response, Ahumada sought leave to file a Second Amended Complaint.  Dist. Ct. Dkt. 157.

The District Court granted the remaining defendants' motions to dismiss.  It ruled that the First Amended Complaint failed to state a claim because the allegations were "genera[l] and conclusory" and lacked "specific facts to support [them]."  JA 608-09.  The District Court added that, by alleging "no facts from which a fact finder could infer [that] . . . any. . . named Defendant knowingly made a false statement or engaged in a fraudulent course of conduct," Ahumada failed to allege scienter.  JA 609.   It also found that Ahumada failed to adequately plead conspiracy under Count III.  JA 610.

At the same time, the District Court ruled that the public disclosure bar eliminated its subject matter jurisdiction.   JA 614.   The court observed that Ahumada's "allegations clearly track the news media stories and the public disclosure clearly appears to be the basis of Relator's claim."  JA 614.  The Court then found that Ahumada failed to demonstrate that he was an "original source" of his allegations because he had been employed at NCED for only six months, and his allegations were so "generalized" and non-specific that they utterly failed to

"sugges[t] how the Relator acquired, or could have acquired, personal knowledge of his allegations, or how Relator's job duties could have put him in a position to learn of them." JA 616.

Finally, the District Court denied Ahumada's motion to file a Second Amended Complaint, calling it "futile." JA 616. Noting that five and a half years had passed since Ahumada's First Amended Complaint, the District Court observed that Ahumada sought to amend only after the remaining defendants moved for dismissal of the case. It ruled that despite this, "the proposed Second Amended Complaint still fail[ed] to cure the deficiencies indicated above in the FAC." JA 616. The District Court added that the public disclosure bar continued to deprive it of jurisdiction because "specific details added to the proposed Second Amended Complaint [were] all information that could be found in the public domain and do not evidence that Relator was in fact the original source of the information." JA 617.

Ahumada appealed.

## STATEMENT OF THE FACTS

NCED was a nonprofit agency located in El Paso, Texas. SAC ¶ 25; JA 234. In the 1990s and early 2000s, NCED had contracts under the Javits Wagner O'Day Act (or "JWOD Program") for the manufacture of protective suits and other

5

apparel for the military, as well as corrugated paper containers for government clients such as the United States Postal Service.  SAC ¶¶ 25, 64, 75; JA 227-69.

The JWOD Program promotes the employment of the blind and severely disabled by instructing the federal government to purchase certain commodities and services from "qualified nonprofit agencies."  41 U.S.C. § 48 (2006); 41 C.F.R. § 51-1.1(a) (2006).  Those nonprofit agencies must use blind or other severely disabled individuals to perform, on an *aggregate annual basis*, at least 75 percent of the direct labor hours required to produce whatever commodities or services they provide ("direct labor requirement").  41 U.S.C. § 48b(4)(C) (2006); 41 C.F.R. § 51-1.3 (2006).

The Committee for Purchase From People Who Are Blind or Severely Disabled ("Committee") administers the JWOD Program.  The Committee publishes a procurement list naming the commodities and services that government agencies must purchase under JWOD.  41 U.S.C. § 47(a) (2006); 41 C.F.R. § 51-2.2(b) (2006).  The Committee also determines the "fair market price" that participating nonprofit agencies may charge for those commodities.  41 U.S.C. § 47(b) (2006); 41 C.F.R. § 51-2.2(c) (2006).  To distribute the government's orders to participating nonprofits like NCED, the Committee designated NISH as a "central nonprofit agency." 41 U.S.C. § 47(c) (2006); 41 C.F.R. § 51-3.1 (2006).

Accordingly, based on the procurement list, NISH helps identify and secure contracting opportunities for participating nonprofits. 41 C.F.R. § 51-3.4 (2006).

On October 18, 2005, *The Oregonian* newspaper published the first in a series of lengthy investigative articles detailing flaws it perceived in the management of the JWOD Program. JA 139-43. The articles focused in part on NCED's lack of compliance with the program's requirements, and criticized both the Committee and NISH for their purportedly lax oversight. Three articles published in March 2006 went into detail about NISH's role in both the JWOD Program and its oversight of NCED. JA 144-56, 186-202.

Starting in November 2005, the *El Paso Times* also published several articles about NCED and its apparent non-compliance with JWOD requirements. JA 204-26. The first articles alleged that manufacturers, including International Paper, Green Bay, and Smurfit Stone, sold containers to NCED allegedly in violation of JWOD requirements. JA 206. The *El Paso Times* intensified coverage after a jointly-conducted Committee-NISH compliance review in January 2006 showed that NCED had not been satisfying the 75 percent direct labor requirement, and NISH recommended that the Committee expel NCED from the JWOD Program. JA 204-24. The *El Paso Times* also covered a March 2006 lawsuit that NCED brought against NISH. In that lawsuit, NCED alleged that NISH unlawfully harmed NCED by recommending its expulsion from the JWOD

7

Program.  JA 157-84.  The complaint described NISH's relationship with NCED at length, detailing the compliance reviews that NISH conducted between 1999 and the date NISH recommended expulsion.  *Id*.

Following *The Oregonian* series, the *El Paso Times* articles, and NCED's lawsuit, on June 20, 2006, Ahumada filed his original Complaint in this matter. The named defendants were NCED and Jones.  JA 17-47.  According to the Complaint, NCED had employed Ahumada for approximately six months, between February and July 2004.  Compl. ¶¶ 75, 99; JA 32, 35.  Ahumada alleged that, during that time, NCED was abusing the JWOD Program and perpetrating a significant fraud on the federal government.  Accordingly, Ahumada's Complaint focused on NCED and outlined various alleged NCED schemes, including secretly switching suppliers, buying complete boxes and passing them off as manufactured by NCED, and collecting rebates and hiding them from the government.  The Complaint made no allegations against any of the current defendants, and indeed did not even *mention* most of them.  JA 17-45.

Several months later, on November 17, 2006, PBS aired a documentary entitled "Charity Begins At Home," which offered a behind-the-scenes look at *The Oregonian*'s investigative series. *See America's Investigative Reports: Charity Begins At Home* (PBS television broadcast November 17, 2006) *available at* http://vimeo.com/61429462 (last visited August 17, 2013) ("AIR Documentary")

8

(*cited* in Dist. Ct. Dkt. No. 157). The documentary criticized NISH for its "weak oversight" of NCED, reported that NCED was unable to document the number of disabled workers it claimed to employ "going back to 1999," and accused NISH of a conflict of interest arising from the fees it earns from the nonprofits it oversees. *Id.* The documentary identified Ahumada as a source for *The Oregonian*, but identified another individual dubbed "Sahara Sarah" (later revealed to be former NCED CFO Brian Kieser, JA 316-54) as its primary source. It also detailed the extensive independent investigation that *The Oregonian* reporters themselves conducted, including through FOIA requests. JA 279-310.

A year after filing his original Complaint, on June 29, 2007, Ahumada filed his First Amended Complaint, adding the current defendants. JA 49. The First Amended Complaint lumped together Green Bay, International Paper, Smurfit Stone and Weyerhaeuser, calling them the "Manufacturing Defendants," and alleged that the "Manufacturing Defendants" had "provided NCED with (1) false invoices for raw sheets when they were actually supplying nearly final products; (2) false invoices inflating the price of containers and not disclosing price rebates; and (3) containers falsely marked with NCED's Box Manufacturing Certificate." JA 608. The First Amended Complaint did not allege that NISH was complicit in any of this supposed conduct. Rather, it alleged generally that NISH knew NCED

was out of compliance with JWOD's direct labor requirement but continued to direct contracts to NCED anyway.  JA 57, 64, 71-72.

As the District Court later observed, the First Amended Complaint was "devoid of any particularized facts" about the remaining defendants.  "Not a single employee, specific communication, the specific products shipped, or a specific invoice that was submitted to the Government is mentioned."   JA 608.  Elaborating, the District Court noted that the First Amended Complaint provided "no details such as the dates the claims were submitted, the government agencies to which the claims were submitted, the identity of the Manufacturing Defendant that produced the containers in question, the content of the forms or the bills submitted, and the amounts of money charged to the Government."  JA 609.  In sum, the First Amended Complaint contained entirely "generalized allegations against multiple parties."  JA 608.

After Ahumada filed the First Amended Complaint, the volume of public information related to the allegations against NCED and NISH's oversight role in the JWOD Program grew significantly.  Three NCED executives, including Jones and Lopez, were the subjects of a 48-page superseding indictment made public in October 2008.  JA 491-539.  Two later pled guilty.  JA 540-42.  Lopez went to trial in October 2010, yielding volumes of transcribed argument from attorneys and testimony from personnel from NCED, NISH, and the Manufacturing Defendants,

among others, relating to NCED's fraud.  JA 311-15.  At the trial, the government called "Sahara Sarah"—NCED's former CFO and the primary source of *The Oregonian* articles—to testify.  Ahumada was not a witness.

Following the government's settlement of the claims against NCED in late 2012, the First Amended Complaint was unsealed.  All remaining defendants promptly moved to dismiss it.  In response, Ahumada sought leave to amend his Complaint yet again.  JA 227-69.  In his proposed Second Amended Complaint, Ahumada for the first time—more than five years after he added the remaining defendants and after a trove of additional, detailed public disclosures—included a handful of allegations addressed to each defendant individually.  Yet, as discussed below, the fraud schemes Ahumada alleged were the same.  In its Memorandum Opinion, the District Court denied Ahumada leave to amend, finding it futile under the public disclosure bar, Rule 12(b)(6), and Rule 9(b).

## SUMMARY OF THE ARGUMENT

I.    The District Court correctly found that the public disclosure bar deprived it of jurisdiction in this case.  Ahumada's allegations are clearly based on public disclosures that occurred before he filed his proposed Second Amended Complaint in 2013.  Newspaper articles, a civil complaint and a documentary from 2005 and 2006, as well as the 2008 indictment of NCED executives and a subsequent 2010 trial, exposed the same allegations that Ahumada makes against

11

the current defendants in his Second Amended Complaint. And contrary to his contentions, Ahumada cannot qualify as an "original source" of these allegations. Nowhere in his complaints or his 2013 affidavit does Ahumada specifically contend that he told the FBI about his allegations against each individual defendant before filing suit against them in 2007. Moreover, Ahumada does not come close to showing he had "direct and independent knowledge" of his allegations. Disqualifying him from original source status, his brief concedes that he learned much of his information about "the JWOD fraud" from *other people* who remained at NCED after he left. Indeed, two of the Manufacturing Defendants—Green Bay and Smurfit Stone—did not even do business with NCED while Ahumada worked there. Nor did Ahumada allege or furnish any other basis for concluding that any of the purported misfeasance he attributes to NISH occurred during his six-month tenure at NCED.

II.     The District Court correctly denied leave to amend on futility grounds because Ahumada's proposed Second Amended Complaint remained deficient under Rule 9(b) and Rule 12(b)(6).

A.     Ahumada did not satisfy multiple aspects of Rule 9(b). He failed to plead with specificity a *single* false claim made to the government and facilitated by the current defendants; instead, he relies on a theory that *every* claim by NCED was false, even though that assertion provides no basis to believe that every current

12

defendant played any role in every one of NCED's claims. Ahumada also failed to plead the details of the fraud in general. The "who, what, when, where, and how" of the fraud are absent from his Second Amended Complaint to such an extent that, contrary to what Rule 9(b) permits, Ahumada must rely entirely on discovery to locate the facts of his own case and the defendants cannot craft coherent defenses. Further, Ahumada failed to adequately distinguish among the defendants. His Second Amended Complaint makes a slew of allegations against the "Manufacturing Defendants" in general, but included no detail about most of those claims as to any one manufacturing defendant specifically.

B.    Ahumada failed to sufficiently plead his claims under Rule 12(b)(6) and the *Twombly* framework.

First, the Second Amended Complaint makes no mention of the element of materiality—*i.e.*, that complying with the direct labor requirement or disclosing rebates was a prerequisite to NCED actually getting paid by the government. Indeed, those were not, in fact, material to payment under the JWOD Program, as shown by the fact that even after NCED's unprecedented violation of the direct labor requirement was exposed, the government did not deny NCED payment but instead simply required a return to compliance.

Second, Ahumada failed to plausibly plead the element of scienter against the Manufacturing Defendants. It is implausible to infer that, by taking orders

13

from NCED, building boxes, and stamping and billing them as its customer desired, the manufacturers knew NCED was using their products to violate JWOD regulations with which they had no familiarity. Ahumada's efforts to plead facts sufficient to raise an inference of "knowing" participation in the fraud further reflect the weakness of that claim.

C.      Ahumada failed to plead the elements of conspiracy as articulated in *Allison Engine*; instead, he contends that later FCA amendments adjusted the elements of conspiracy favorably to him. However, the FCA amendments, by their terms, do not apply to conspiracy counts pre-dating 2009.

D.      Ahumada has abandoned any argument that Count IV states a claim by failing to brief it.

## ARGUMENT

## I.    THE DISTRICT COURT CORRECTLY FOUND THAT THE FCA'S PUBLIC DISCLOSURE BAR DEPRIVED IT OF JURISDICTION TO ADJUDICATE AHUMADA'S CLAIMS AGAINST THE REMAINING DEFENDANTS.

At the time Ahumada brought suit in 2006, the FCA provided that "[n]o court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions . . .  unless . . . the [private] person bringing the action is an original source of the information."  31 U.S.C. §

3730(e)(4)(A) (2006).[3]  This provision, known as the public disclosure bar, is "jurisdiction-removing."  *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 468 (2007).  Its purpose is "to prevent 'parasitic' *qui tam* actions in which relators, rather than bringing to light independently-discovered information of fraud, simply feed off of previous disclosures of government fraud."  *United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1347 (4th Cir. 1994).

Once a motion to dismiss an FCA suit on public disclosure bar grounds is filed, a relator must bear "the burden of proving by a preponderance of the evidence" that the allegations are not based upon public disclosures.  *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 348 (4th Cir. 2009) (citing *Rockwell*, 549 U.S. at 468).  Failing that, he must bear the separate burden of proving that he is an "original source"—*i.e.*, "an individual who has [1] direct and independent knowledge of the information on which the allegations are based and [2] voluntarily provided the information to the Government before filing an action under this section which is based on the information."  *Id.* at 348-49; 31 U.S.C. § 3730(e)(4)(B) (2006).  Accordingly, a Rule 12(b)(1) dismissal of a relator's suit is proper if the *qui tam* complaint is (1) "based upon" information that was "publicly disclosed," and (2) the relator was not the "original source" of such information.

---

[3] Ahumada suggests that the amended version of Section 3730(e)(4) adopted in 2010 applies here.  Appellant's Br. 13.  The amendments, however, are not retroactive to cases filed prior to their enactment.  *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 283 n.1 (2010).

*Grayson v. Advanced Mgmt. Tech., Inc.*, 221 F.3d 580, 582 (4th Cir. 2000) (citing *Siller*, 21 F.3d at 1346-47).

The fact findings the District Court made in concluding that Ahumada's allegations are based upon prior disclosures and that Ahumada is not an original source are reviewed for clear error. *Vuyyuru*, 555 F.3d at 348 (noting also that ultimate application of the jurisdictional bar is a legal conclusion reviewed *de novo*). Ahumada concedes that the findings he is challenging should be reviewed under the clear error standard. Appellant's Br. 12.

### A. The District Court Properly Found that Ahumada's Allegations Were Based Upon Publicly Disclosed Information.

The Fourth Circuit considers FCA allegations to be "based upon" a public disclosure where the allegations are "actually derived from" the disclosure. *Vuyyuru*, 555 F.3d at 350 (quoting *Siller*, 21 F.3d at 1348). Importantly, the public disclosure bar "encompasses actions even *partly* based upon prior public disclosures." *Vuyyuru*, 555 F.3d at 351 (emphasis added) (citing *United States ex rel. Boothe v. Sun Healthcare Grp., Inc.*, 496 F.3d 1169, 1176 n.6 (10th Cir. 2007); *see also United States ex rel. Ackley v. IBM Corp.*, 76 F. Supp. 2d 654, 661 (D. Md. 1999) ("If a complaint had to be totally derived from public disclosures for the bar to apply, a relator could avoid the bar simply by adding a few previously undisclosed facts or transactions . . . to a number of previously disclosed ones, then

proceed without having to demonstrate his direct and independent knowledge of any of the transactions.").

Ahumada limits his appeal to arguing that he was an original source of the allegations against the remaining defendants.  In so doing, he concedes that, as the District Court found, those allegations are strikingly similar to information that flooded the public domain not only before he filed his Second Amended Complaint in February 2013—which is the proper date for determining whether the public disclosure bar applies, *Rockwell*, 549 U.S. at 473-74—but even before he named the remaining defendants in his First Amended Complaint in June 2007.  JA 614-17 (finding Ahumada's allegations "clearly track these news media stories [in *The Oregonian* and *El Paso Times* in 2005-2006];" the stories "clearly appear to be the basis of Relator's claim…;" "other publicly disclosed materials such as articles in the *Oregonian* and *El Paso Times*, and a civil complaint NCED filed against NISH in Texas state court, also demonstrate the factual allegations of the FAC were widely known;" "[t]he specific details added to the Second Amended Complaint are all information that can be found in the public domain;" and "[t]he PSAC is likewise based upon a public disclosure.").  Given the volume of prior public disclosures, it is not hard to see why Ahumada makes this concession.

### 1.    Manufacturing Defendants

Ahumada's central common allegation against the Manufacturing Defendants is that each knowingly manufactured boxes for NCED at its own facility, stamped them with NCED's manufacturing certificate, and then provided them to NCED for sale to the government under the JWOD Program.  Appellant's Br. 6-8; SAC ¶¶ 125-55; JA 256-62.  That exact allegation appeared in the *El Paso Times* seven months before Ahumada filed his original complaint, over a year and a half before he filed the First Amended Complaint and over seven years before the Second Amended Complaint.  One article, which Ahumada actually cites in the Second Amended Complaint, appeared on November 27, 2005.  SAC ¶¶ 119-20; JA 254-55.  It accused NCED of abusing the JWOD program by buying completed boxes with NCED's stamp from the Manufacturing Defendants, and then selling them to the government under "no-bid federal contracts" that required NCED itself to make the boxes in compliance with JWOD's direct labor requirement.  JA 205-07.  The article specifically identifies Smurfit Stone, Green Bay, and International Paper as participants in the alleged scheme.  *Id.*  Another news article, dated December 6, 2005, reiterated that NCED had "contracted with commercial companies to have the boxes made and then sold them to the government."  JA 564-65.

By the time Ahumada attempted to file his Second Amended Complaint in 2013, his allegations against the Manufacturing Defendants not only had been published in news media years before, but had been aired extensively in 2010 at the Lopez trial. As Ahumada himself acknowledged, "all of the Manufacturing Defendants . . . testified that they did make boxes for NCED and stamped NCED's BMC on them." SAC ¶ 121; JA 255. Ahumada went on to allege that specific employees of Green Bay, International Paper, and Smurfit Stone testified at the Lopez trial about the volume of their employers' box and postal sleeve sales to NCED, and their practice of marking the boxes with NCED's stamp. SAC ¶¶ 119-21, 130, 136, 147; JA 254-61. Ahumada expressly relied on that testimony in his Second Amended Complaint. *Id.* The similarities between the allegations against the Manufacturing Defendants in the Second Amended Complaint on the one hand, and the *El Paso Times* stories and Lopez trial testimony on the other, are so striking that, as the District Court correctly determined, Ahumada cannot have carried his burden of showing that the allegations are not based upon prior disclosures.

## 2.    NISH

The public record prior to the filing of the Second Amended Complaint in February 2013 is replete with public disclosures of each allegation Ahumada

19

makes against NISH.  Most of the disclosures occurred even before the filing of the First Amended Complaint in June 2007.

### a.    NISH's compliance reviews

Ahumada first alleged that NISH was aware of NCED's non-compliance with JWOD's direct labor requirement because, during "at least three" audits beginning in 1999, NISH found inadequate documentation of compliance and observed a substantial number of non-disabled employees, SAC ¶¶ 73, 74, 78, 101, 102, 111, 162; JA 243-244, 249-50, 253, 263, and because Ahumada told a NISH employee in 2004 that NCED was non-compliant.  SAC ¶¶ 106, 111; JA 251, 253. Numerous public sources informed this allegation.

First, there were newspaper reports and a documentary.  In March 2006, before Ahumada ever named NISH as a defendant, *The Oregonian* published several articles that discussed, *inter alia*, NISH's compliance reviews.  *See* JA 153 ("Officials with the committee and NISH began examining in 1999 whether the nonprofit used enough labor from severely disabled workers.  By May 2000, officials on three separate occasions had found inadequate documentation to back up disability claims.  The problems did not stop the nonprofit from building its business year after year");[4] JA 191-93.  Meanwhile, between November 2005 and

---

[4] As the District Court observed, the allegations in the First Amended Complaint appear to have been lifted almost *verbatim* from the March 5, 2006, *Oregonian*

June 2006, the *El Paso Times* published at least six articles addressing the compliance reviews. JA 205-26. In November 2006, the AIR documentary about NCED did the same. At approximately 19:25 on the video recording, the narrator reported how an *Oregonian* reporter used FOIA requests to learn that "going back to 1999, both the JWOD Committee and NISH officials knew NCED couldn't sufficiently document the number of disabled workers it claimed to employ."[5]

Second, the lawsuit NCED filed against NISH in March 2006 contained comprehensive allegations regarding NISH's oversight of NCED. As the District Court observed, the lawsuit identified and discussed the results of each of NISH's compliance reviews between 1999 and 2005. JA 615; *see also* JA 162, 166-67, 172. As Ahumada would later do, it also expressly alleged that "NISH and the Committee had been complicit in the manner in which Plaintiff NCED reported its ratios for years." JA 171.

Third, at the Lopez trial in 2010, multiple witnesses (but not Ahumada, who was not called) testified about NISH's compliance reviews. JA 412, 414-18, 422

---

article. JA 615. There are certainly "remarkable similarities" between the two. *Id.*; *Vuyyuru*, 555 F.3d at 350-351.

[5] At least six articles published by *El Paso Times* in 2006, as well as a March 10, 2006, article in *The Oregonian*, also reported that a joint Committee-NISH audit in early 2006 revealed that only 7.8 percent of NCED's direct labor hours had been performed by employees documented to have severe disabilities. JA 197-203, 544-53. Ahumada cites this fact to support his claim that NISH must have known of NCED's non-compliance beforehand. SAC ¶¶ 52, 110; JA 239, 252.

(testimony of NISH employee Victor Dennis); JA 395-96 (testimony of Committee compliance officer Louis Bartalot). Other witnesses specifically claimed that NISH had to have known of NCED's shortcomings. JA 450-59, 463, 466-69, 481-82 (Lopez testimony that NISH and the Committee knew NCED was combining disabled workers and "disadvantaged" workers for the purpose of meeting the direct labor requirement); JA 440-46 (Jones testimony that NISH knew the percentages of severely disabled employees included in the compliance-certification forms reflected a combination of disabled and "disadvantaged" employees). Lopez's lawyer drove the point home in closing, arguing that NISH's compliance reviews made NCED's non-compliance "common knowledge." JA 486-87.

### b.    404 Forms

Next, Ahumada alleged that NISH annually signed a "404 Form" acknowledging NCED's representation of compliance with JWOD's direct labor requirement, even though NISH knew NCED was non-compliant. SAC ¶¶ 104, 105, 111, 163; JA 250-51, 253, 264. This allegation, too, appeared in the public domain well before Ahumada filed his Second Amended Complaint.

*The Oregonian* initially disclosed NISH's execution of the 404 Forms in March 2006. JA 203 (containing photograph of NCED's 2005 404 Form signed by NISH employee). Later, from 2008-2010, the 404 Forms became a principal focus

22

of the criminal proceedings against NCED officials.  Notably, Ahumada never mentioned the 404 Forms in the First Amended Complaint in 2007, referring to them for the first time in the Second Amended Complaint in 2013—well *after* the NCED criminal proceedings concluded.

The falsified 404 Forms were the linchpin of the crimes actually *charged* against Jones and Lopez in Counts 14-18 and 22-24 of the 2008 superseding indictment.  JA 495 (at ¶ 15); *id*. JA 514-15 (at ¶¶ 3-9); JA 518-19; JA 521 (at ¶ 2); JA 513 (at ¶ 7); JA 528-29.  Naturally, then, the 2003-2005 404 Forms themselves were introduced as exhibits and used heavily at the trial.  *See, e.g.*, JA 369-70. Additionally, the trial featured considerable testimony and argument about NISH's signing the forms and submitting them to the Committee.  JA 333-36 (Kieser testimony about submission of forms to NISH); JA 369, 374-75 (Dennis Fields testimony that he signed 404 Forms from 2004-2005 and the CFO signed them in 2003);  JA 413, 421 (Victor Dennis testimony about NISH's signature on 404 Forms); JA386-87, 392-94, 397-400 (Bartalot testimony that, *inter alia*, he thought NISH knew NCED was combining disabled and "disadvantaged" employees for direct hour compliance purposes and would review the matter before signing the Form 404 but did not); JA 488 (defense closing argument).  Because the Second Amended Complaint itself refers to trial testimony about NISH's signing the 404

Forms, Ahumada effectively acknowledges that his allegations about the 404 Forms are derived from prior disclosures.  SAC ¶ 109; JA 252.

### c.    NISH's purported conflict of interest

Lastly, Ahumada alleged that, despite its awareness of NCED's non-compliance, NISH continued to direct JWOD contracts to NCED because of the substantial fees it earned from them.  SAC ¶¶ 59, 103, 105, 112, 163; JA 240, 250-51, 253, 264.  Long before 2013, the same allegation appeared in numerous public media.

Again, newspaper reports and the AIR Documentary created a blueprint for Ahumada's claims.  Matching the First and Second Amended Complaints almost word-for-word, as the District Court observed, JA 615, a March 2006 *Oregonian* article pre-dating Ahumada's complaints asserted that the commissions NISH earned from NCED contracts "helped boost NISH's revenue 86 percent over four years, to $58 million in 2004."  JA 153.  Insinuating that NISH suffered from a conflict of interest, the article added that NCED's "inadequate documentation to back up disability claims" as of May 2000 "did not stop the nonprofit from building its business year after year."  *Id*.; *see also* JA 201, 205.  Similarly, the AIR Documentary alleged that NISH had a financial motive to turn a blind eye to NCED's conduct, asserting that NISH's oversight role was compromised by a

24

conflict of interest arising from the fees NISH earns from the non-profits whose JWOD compliance it oversees.  AIR Documentary, 19:45.

Evidence at the Lopez trial also addressed NISH's purported conflict of interest.  The Committee's Lou Bartalot testified that, according to a General Accountability Office report, "there was a potential conflict of interest since NISH gets its funding from a fee that each of the nonprofit agencies pay to them," and if NISH found a nonprofit to be out of compliance, "[p]otentially [NISH] could lose money."  JA 398.  And in fact, the GAO had issued a report in 2007 suggesting that NISH's oversight role created a conflict of interest.  U.S. Gov't Accountability Office, GAO-07-236, *Federal Disability Assistance: Stronger Federal Oversight Could Help Assure Multiple Programs' Accountability* 29 (2007), *available at* http://www.gao.gov/new.items/d07236.pdf (last visited August 21, 2013, and quoted below in Dist. Ct. Dkt No. 176 at 15).[6]

These voluminous materials demonstrate conclusively that, as the District Court found, Ahumada did not carry his burden of showing that the First and

---

[6] "The GAO found that '[t]he Committee for Purchase's regulations create at least two problems for NIB and NISH: the potential for a conflict of interest resulting from a lack of organizational independence *as well as disincentives to perform their monitoring duties effectively. ... [The] system of compensation may create a disincentive for NIB and NISH to identify instances of noncompliance that could result in the JWOD nonprofit agency losing its contract, especially for those JWOD nonprofit agencies that are generating large volumes of JWOD sales . . .'* GAO Report, at 29."  Dist. Ct. Dkt. 176 at 15 (emphasis added).

Second Amended Complaints' allegations against NISH were not derived from prior public disclosures.

### B. The District Court Correctly Found That Ahumada Was Not An "Original Source."

To qualify as an "original source," Ahumada must show by a preponderance of the evidence that: (1) he reported his allegations against the remaining defendants to the government prior to filing suit, *and* (2) he has "direct and independent knowledge" of the allegations against the remaining defendants – *i.e.*, knowledge "acquired . . . through his own efforts, without intervening agency, and . . . not dependent on public disclosure." 31 U.S.C. § 3730(e)(4)(B);[7] *Grayson, Inc.,* 221 F.3d at 583. To satisfy the "direct and independent knowledge" requirement:

> [A] *qui tam* plaintiff must allege specific facts—as opposed to mere conclusions—showing exactly how and when he or she obtained direct and independent knowledge of the fraudulent acts alleged in the complaint and support those allegations with competent proof. Only in this way will the district court be able to adequately identify legitimate *qui tam* actions and weed out parasitic plaintiffs who offer only secondhand information, speculation, background information or collateral research. . . . A mere assertion of knowledge, without adequate basis in fact and unsupported by competent proof, is insufficient to establish jurisdiction.

---

[7] Ahumada uses § 3730(e)(4) as amended in 2010 to articulate the standard for establishing original source status. Appellant's Br. at 13-14. Again, the 2010 amendments version is not retroactive and does not apply here. *See* note 1, *infra.* The version excerpted above does.

*United States ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1162-63 (10th Cir. 1999). As the District Court correctly determined, Ahumada was not an "original source" of his allegations against any of the remaining defendants. JA 614-17.

First, Ahumada cannot show that he reported his allegations against the remaining defendants to the government before filing suit. Throughout his brief, Ahumada states that he went to the government with his allegations about "the JWOD fraud" before he filed the First Amended Complaint naming the remaining defendants in June 2007. Appellant's Br. 10, 14-15. But despite the numerous chances he has been given to say directly that he went to the government with his specific allegations *about individual current defendants*—not just about NCED or "the JWOD fraud" generally—he has assiduously avoided doing so. Indeed, the First Amended Complaint, the Second Amended Complaint, and Ahumada's March 2013 affidavit lack *any* assertion that before June 2007, Ahumada complained to the FBI,[8] the Postal Inspection Service or any other government agency that NISH or any specific manufacturing defendant submitted or facilitated

---

[8] Inasmuch as Ahumada had a discussion with the FBI in April 2006, *see* SAC ¶ 20; JA 232-33, it occurred only *after* the March 5, 6 and 10 articles in *The Oregonian*, *after* NCED filed its lawsuit against NISH, and *after* publication of most of the *El Paso Times* articles. Ahumada did not establish that he discussed any allegations against NISH or any specific Manufacturing Defendant with the FBI in April 2006. Further, the April 2006 discussion cannot demonstrate that he had direct and independent knowledge—as opposed to knowledge obtained from prior public disclosures—of any information he might have conveyed to the FBI.

a false claim to the government. *Cf.* SAC ¶ 20; JA 232 (not mentioning NISH or any action taken by NISH at all, and addressing the others only as "Manufacturing Defendants" generally). Accordingly, Ahumada has not shown, with the requisite particularity, that he informed the government about his specific allegations against the remaining defendants prior to bringing suit. *See, e.g., United States ex rel. Detrick v. Daniel F. Young, Inc.*, 909 F. Supp. 1010, 1022-23 (E.D. Va. 1995) (relator must meet, but failed to meet, Rule 9(b) particularity in establishing original source status).

Second, Ahumada cannot satisfy the direct and independent knowledge requirement against any remaining defendant. As a threshold matter, by failing to carry his burden of showing that his allegations against the remaining defendants are not derived from prior public disclosures, Ahumada is incapable of establishing that he acquired direct and independent knowledge of them. *United States ex rel. Davis v. Prince*, 753 F. Supp. 2d 569, 582-83 & n.21 (E.D. Va. 2011) (observing that, because of the Fourth Circuit's test, a relator whose allegations are "based upon" prior public disclosures necessarily cannot establish that he is an original source of the allegations).

Further, Ahumada concedes in his opening brief that he obtained much of his information about "the JWOD fraud" (he does not identify specific defendants) from *other people* who remained at NCED after he left. Appellant's Br. 21; *see*

28

*also* JA 578 (affidavit explaining that Ahumada obtained information after he left NCED from Jesse Cruz, Lorenzo Valverde, and Brian Kieser). Having done so, he is disqualified as an original source. *Grayson*, 221 F.3d at 583 (to qualify as original source, relator must obtain information "through his own efforts, *without an intervening agency*" (emphasis added)); *Hays v. Hoffman*, 325 F.3d 982, 990-91 (8th Cir. 2003) ("'[A] person who obtains secondhand information from an individual who has direct knowledge of the alleged fraud does not himself possess direct knowledge of the alleged fraud and therefore is not an original source.' . . . [T]o be independent, the relator's knowledge must not be derivative of the information of others, even if those others may qualify as original sources.") (citation omitted); *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins.* Co., 944 F.2d 1149, 1160-61 (3d Cir. 1991) ("Stinson's information about Prudential came through two intermediaries: the unknown Provident employee responsible for the telephone call and notation and the discovery procedure by which the memoranda were produced. Therefore, Stinson cannot be deemed to have had 'direct' knowledge of the manner in which Prudential processed its working seniors' claims.").

Additional facts demonstrating Ahumada's failure to establish original source status as to his allegations against certain remaining defendants are addressed below.

### 1.    Manufacturing Defendants—Green Bay and Smurfit Stone

Because Ahumada did not even work for NCED at the time NCED made purchases from Green Bay and Smurfit, Ahumada's allegations against them could not possibly be based on direct and independent knowledge. Ahumada worked at NCED from February to July 2004. SAC ¶ 18; JA 232. Yet NCED's president refused to order from Green Bay during Ahumada's employment, and did not begin purchasing postal sleeves from Green Bay until February 2005. SAC ¶¶ 121, 130; JA 256-57. NCED also did not begin purchasing postal sleeves from Smurfit until sometime in 2005. SAC ¶¶ 144, 147; JA 260-61. Ahumada, therefore, was not in a position to obtain firsthand knowledge of the allegations he made against either Green Bay or Smurfit, and cannot be an original source of his allegations against either company.[9] *Rockwell*, 549 U.S. at 475 (relator failed to prove original source status because the only false claims jury found involved "insolid pondcrete" discovered after relator left his employment); *Vuyyuru*, 555 F.3d at 352 (relator could not be original source regarding allegations of fraud after March 2003 because he had stopped practicing medicine at defendant's facility by then).

---

[9] Ahumada openly relied on the November 27, 2005, *El Paso Times* article and on Lopez trial testimony from Green Bay and Smurfit employees to establish that the companies made the purportedly offending sales to NCED. SAC ¶¶ 119, 130, 147; JA 254, 257, 260-61.

## 2.    NISH

Ahumada's knowledge of his allegations against NISH also could not possibly be direct and independent. Ahumada did not allege that any of the NISH compliance reviews and "tours" of NCED, falsified 404 Forms, failures to recommend NCED's expulsion from the JWOD Program, or fee payments from NCED occurred during the six months that he worked at NCED. *See Rockwell*, 549 U.S. at 475; *Vuyyuru*, 555 F.3d at 352. Nor, as the District Court found, is there anything in the text of the First Amended Complaint, the Second Amended Complaint, or Ahumada's affidavit to suggest how Ahumada acquired, or even could have acquired, personal knowledge of his allegations regarding any of these matters. JA 614, 616-17. None of those documents indicates that Ahumada learned about the compliance reviews and tours, the 404 Forms, the failure to recommend NCED's expulsion from the JWOD Program, or the fees NISH earned at any point during his short-lived tenure at NCED.[10] Nor do they provide a clue about how Ahumada's job duties could have put him in a position to learn about

---

[10] In fact, the only source of information the Second Amended Complaint cites reflecting the basis of Ahumada's knowledge of the 404 Forms and their role in the alleged scheme is testimony from the Lopez criminal trial. *See* SAC ¶ 109; JA 252 (referring to testimony of Victor Dennis). Similarly, Lopez trial testimony is the only source the Second Amended Complaint cites for Ahumada's knowledge that, because a 2006 audit showed NCED's severely disabled direct labor hours ratio to be 7.8 percent, NISH had to have known that NCED was out of compliance with JWOD requirements beforehand. *See* SAC ¶ 110; JA 252 (referring to Dennis testimony).

these matters.  And they could not have done so, because as the *Oregonian* articles, NCED's civil complaint, and evidence from the *Lopez* proceedings show, neither the reviews nor the execution of the 404 Forms occurred during his employment with NCED.  In short, notwithstanding Ahumada's repeated protests that he was "the source"[11] of information for the news articles that were published before the First Amended Complaint was filed, Appellant's Br. 10-11, 15-17, nothing in Ahumada's complaints or affidavit demonstrates that Ahumada acquired knowledge of his allegations against NISH "through his own efforts, without an intervening agency." *Grayson*, 221 F.3d at 583; *see also Hafter*, 190 F.3d at 1162.

Stripped to their essence, Ahumada's complaints and affidavit allege only that he supplied unspecified "information" about NCED—not NISH—to *The Oregonian* and *El Paso Times*.  SAC ¶ 21; JA 233; JA 577-78.  Such an abject failure to articulate direct and independent knowledge, or "support [it] with competent proof," precludes Ahumada from achieving original source status. *Hafter*, 190 F.3d at 1162-63; *Davis*, 753 F. Supp. 2d at 583, 595-96.

The only allegation regarding NISH as to which Ahumada expressly claims direct and independent knowledge is the allegation that he reported NCED's non-

---

[11] The AIR Documentary made clear that Ahumada was not "the source" for the articles regarding NCED's non-compliance with JWOD requirements.  The primary source was a longer-tenured, more well-placed NCED manager, CFO Brian Kieser (dubbed "Sahara Sarah,").  JA 328.  Moreover, *The Oregonian* conducted significant independent investigation of its own.  *See* AIR Documentary.

compliance with JWOD's direct labor requirement to NISH employee Jean Ann Grandinetti at some point in 2004. Appellant's Br. 9, 22-23; SAC ¶¶ 106-07; JA 251; JA 576. Even this allegation does not establish Ahumada as an original source. The allegation does not assert that Ahumada included in his purported communication information that NISH, as opposed to NCED, was engaging in fraudulent conduct; the rather clear insinuation is that Ahumada reported information to Ms. Grandinetti about NCED, not anyone else. JA 576. Accordingly, nothing in the alleged communication suggests that Ahumada had direct and independent knowledge of a false claim facilitated by NISH. Moreover, the mere fact of the alleged communication, without more, cannot establish that Ahumada had direct and independent knowledge of a false claim facilitated by NISH. That is because NISH's passive receipt of the alleged communication is simply not a false claim. Without Ahumada also having directly acquired— "through his own efforts without intervening agency"—information about the actual submission of a false claim, or of a false statement to get a claim paid, Ahumada does not possess the direct and independent knowledge necessary to establish original source status. *See, e.g., Vuyyuru*, 555 F.3d at 353 (denying original source status to relator who did not have direct and independent knowledge of element of FCA claim); *Davis*, 753 F. Supp. 2d at 583, 595-96

(denying original source status to relator who had direct and independent knowledge of certain facts, but not of alleged fraud).

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING LEAVE TO AMEND ON FUTILITY GROUNDS BECAUSE THE SECOND AMENDED COMPLAINT REMAINED DEFICIENT UNDER RULES 9(b) AND 12(b)(6).

A "district court may deny leave if amending the complaint would be futile—that is, 'if the proposed amended complaint fails to satisfy the requirements of the federal rules.'"  *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008); *see also United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 454 (4th Cir. 2013).  In *Wilson*, the Fourth Circuit affirmed the denial of relators' motion for leave to amend their *qui tam* action because the proposed amended complaint still failed to state a claim under Rule 12(b)(6) and lacked sufficient particularity under Rule 9(b).  525 F.3d at 376.  In addition to its failure to establish subject matter jurisdiction, *see* Section I, *supra,* the proposed Second Amended Complaint here suffers from the same two deficiencies.  The District Court did not abuse its discretion by denying leave to amend on futility grounds.

### A.    The Applicable Law Is the 2006 Version of the FCA

Ahumada persistently cites the post-2009 version of the False Claims Act for each of his claims.  SAC ¶¶ 12, 167-181; JA 230, 264-66; Appellant's Br. 34, 40, 43.  Ahumada also urges that the post-2009 version applies here, and that the

amendments changed the statute in ways favorable to him. *See, e.g.,* Appellant's Br. 39 (claiming that "the district court ignored the 2009 amendments to the FCA"); *id.* at 34 ("The FCA now expansively defines 'knowing' and 'knowingly' to include deliberate ignorance or reckless disregard of the truth").[12] The post-2009 version of the FCA, however, does not apply here.

On May 20, 2009, Congress passed the Fraud Enforcement and Recovery Act, known as FERA. Pub. L. No. 111-21. FERA tweaked the text of all four provisions relevant to this case. *Compare* 31 U.S.C. § 3729(a)(1), (2), (3), and (7) (2006) to 31 U.S.C. § 3729(a)(1)(A), (B), (C), and (G) (2009). FERA also expressly states its effective date. It instructs that, in general, "amendments made by this section shall take effect on the date of enactment of this Act and shall apply to conduct on or after the date of enactment." Pub. L. No. 111-21, § 4(f). The Second Amended Complaint brings claims based on conduct that occurred long before FERA's effective date in 2009. Therefore, the old version of the statute governs this case. In particular, Counts I, III, and IV are controlled by former § 3729(a)(1), § 3729(a)(3), and § 3729(a)(7).

As for Count II, FERA instructs that the new § 3729(a)(1)(B), which replaced § 3729(a)(2), "shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act . . . that are pending on or after that date."

---

[12] In fact, the 2009 amendments did not change the definition of "knowingly" at all. *Compare* 31 U.S.C. § 3729(b) (2006) *with* 31 U.S.C. § 3729(b) (2009).

35

*Id.* A circuit split has arisen about whether "all claims under the False Claims Act that are pending" means all pending *claims for payment* or all pending *cases*.[13] The remaining defendants have argued, and continue to contend, that § 4(f) refers to claims for payment, not cases and, therefore, that the old § 3729(a)(2) applies because the claims for payment in this case were made long before June 2008. Dist. Ct. Dkt. 185 at 2-5. However, this Court can decide this case without wading into the circuit split over retroactivity, because regardless of whether old § 3729(a)(2) or new § 3729(a)(1)(B) applies, Ahumada has failed to state a claim in Count II. Both versions require scienter, materiality, and both particularized and plausible pleading under Rule 9(b) and Rule 12(b)(6). The Second Amended Complaint satisfies none of these requirements.

### B. The Second Amended Complaint Fails to Meet the Particularity Requirements of Rule 9(b).

Fraud claims under the FCA must be pleaded with particularity. Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); *Wilson*, 525 F.3d at 379 (requiring that a relator plead "the 'who, what, when, where, and how' of the alleged fraud"). The Fourth Circuit recently clarified this standard under the FCA by refusing to

---

[13] The Ninth and Eleventh Circuits have held that "claims" refers to a request for payment or approval, while the Second, Sixth, and Seventh Circuits have held "claims" means "civil actions" or "cases." *See Sanders v. Allison Engine Co.*, 703 F.3d 930, 941 (6th Cir. 2012), *cert. denied,* 133 S. Ct. 2855 (2013) (collecting cases).

accept a relator's contention that he "need only allege the existence of a fraudulent scheme that supports the inference that false claims were presented to the government for payment." *Takeda*, 707 F.3d at 456; *id.* ("We decline to accept Relator's argument for a more lenient application of [Rule 9].").  The Court maintained that it has always "adhered firmly to the strictures of Rule 9(b) in applying its terms to cases brought under the [FCA]." *Id.* at 456.

Rule 9(b) exists: (1) to ensure "that the defendant has sufficient information to formulate a defense;" (2) "to protect defendants from frivolous suits;" (3) "to eliminate fraud actions in which all the facts are learned after discovery;" and (4) to protect defendants from "harm to their goodwill and reputation." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).  As the Fourth Circuit has observed, these "purposes may apply with particular force in the context of the [False Claims] Act." *Takeda*, 707 F.3d at 456.  Here, the Second Amended Complaint fails to provide the remaining defendants with enough detailed information to formulate their respective defenses, fails to provide enough detail to justify harming the defendants' goodwill and reputations, and produces the dangers that flow from seeking to build an FCA case through future discovery.

### 1. Ahumada failed to plead a single false claim submitted to the government.

Ahumada's failure to identify a single false claim dramatically displays his failure to plead the specific "who, what, when, where, and how" of the alleged

fraud and his complete reliance on future discovery to make his case. To plead an FCA claim with particularity, a relator "'must provide details that identify particular false claims for payment that were submitted to the government.'" *United States ex rel. Sikkenga v. Regence Bluecross Blueshield*, 472 F.3d 702, 727 (10th Cir. 2006) (quoting *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 232 (1st Cir. 2004)). In *Takeda*, this Court recently clarified that general allegations of a fraudulent scheme, "in the absence of an assertion that a specific false claim was presented to the government for payment," are not sufficient under Rule 9(b). 707 F.3d at 456.[14]

Ahumada's Second Amended Complaint, like his first, merely alleges a generalized series of schemes, focusing on NCED. His entire case is about financial fraud based on claims by NCED that either inaccurately implied compliance with the direct labor requirement or were inflated because they did not reflect the alleged rebates. But not a single bill from any manufacturer, or even from NCED to the government, is appended to or even quoted in the Second Amended Complaint. Of the "hundreds or thousands" of fraudulent NCED claims

---

[14] Ahumada inaccurately urges that *Takeda* does not apply. Appellant's Br. 34-39. However, the *Takeda* Court announced this rule: "We hold that when a defendant's actions, as alleged and as reasonably inferred from the allegations, *could* have led, but *need not necessarily* have led, to the submission of false claims, a relator must allege with particularity that specific false claims actually were presented to the government for payment." *Id.* at 457. That rule applies here because it fits the alleged actions of the Manufacturing Defendants and NISH.

for payment that the remaining defendants allegedly facilitated, Ahumada fails to specifically identify even one of them. Not one.

To defend this lack of specificity, Ahumada urges that he need not have identified any particular false claim because *all* of NCED's claims for payment were false and fraudulent. Appellant's Br. 34-39. In other words, Ahumada attempts to avoid his obligation to plead specific false claims by pleading even more broadly. That simply does not work—especially not with several alleged fraudulent schemes, multiple defendants who cannot possibly all have participated in each scheme or each claim to the government and, in Ahumada's own words, "hundreds or thousands of claims for payment." Appellant's Br. 36 n.6.

Indeed, even if Ahumada could theoretically avoid his obligation to identify a single specific false claim by alleging that every bill was fraudulent, he certainly cannot do so here. Given the facts as Ahumada has pleaded them, not every bill was fraudulent, and even if they were, not every manufacturer participated in every bill. Each manufacturer cannot possibly have played a role in building each box, and the Second Amended Complaint admits that NCED itself did build some boxes. SAC ¶¶ 20, 106; JA 232, 251. Therefore, any NCED bill to the government based on boxes actually built by NCED would not be "caused" by the manufacturers, regardless of NCED's compliance with JWOD.

**2.  Ahumada failed to allege any other particulars, instead claiming nothing more than a theory of fraud in search of facts that would improperly depend on discovery to develop.**

The Fourth Circuit recently "emphasized that a claim brought under the [False Claims] Act that 'rest[s] primarily on facts learned through the costly process of discovery . . . is precisely what Rule 9(b) seeks to prevent.'" *Takeda*, 707 F.3d at 456 (quoting *Wilson*, 525 F.3d at 380).  This Court has carefully policed that rule in cases similar to this one.

In *United States ex rel. Godfrey v. KBR, Inc.*, 360 F. App'x 407 (4th Cir. 2010), the relator claimed that a government contractor had accepted and paid inflated invoices from its subcontractors, then passed those inflated costs on to the government.  The relator alleged generically how he believed the scheme worked: the subcontractors provided dining services on military bases overseas, and then overstated the number of service members actually fed, thus leading to improperly inflated government bills.  But that description was not detailed enough.  As the Court pointed out, the complaint failed to allege the specifics of the relationship among the defendants, and additionally failed to allege "the specifics of *anything*—the terms of the subcontracts, the amounts claimed by the subcontractors on the invoice, or the amounts that should have been claimed." *Id.* at 411.  The relator's claims amounted at best to an interesting theory in search of supporting facts—exactly what Rule 9(b) exists to prevent. *Id.* ("[Relator's]

40

suggestion that he should be able to ferret out that kind of detail through discovery is without merit.").

Similarly, in *United States ex rel. Elms v. Accenture LLP*, 341 F. App'x 869 (4th Cir. 2009), the relator alleged a rebate scheme similar to the one Ahumada has claimed here. Elms claimed that his employer subcontracted certain work, passed the costs to the government, and then secretly accepted rebates from the subcontractor. This Court held that Elms' complaint was properly dismissed under Rule 9(b) because Elms "fail[ed] to allege specifics of any single credit or rebate and provides no detail of his conclusory allegations that Accenture engaged in fraudulent billing practices," including failing to "attribute [the] alleged misrepresentation to any Accenture employee or identify where or when any such representation was made." *Id.* at 873. In rejecting Elms' claims, the Court noted that he had provided the Court "only one invoice" and "failed to allege with particularity any alleged rebate or credit." *Id.*

Ahumada's allegations are remarkably similar to the ones found deficient in *Godfrey* and *Elms.* As against all of the remaining defendants, Ahumada's claims amount to nothing more than an interesting theory of liability groping for factual support. The specific "who, what, when, where, and how" of the alleged fraud are simply absent. The Second Amended Complaint never says when any specific fraudulent invoice was submitted, who submitted it, the circumstances rendering it

41

fraudulent, or whether the government paid the claim. This is an especially egregious failure given that Ahumada is making a *third* attempt at pleading his case—one for which he claims to be an "original source."

### 3. Ahumada's frequent failure to distinguish among individual defendants underscores the deficiencies in his specific allegations against each one.

Rule 9(b) also requires Ahumada to carefully distinguish the actions and intent of each defendant, as distinct from the others. As the District Court correctly observed, "in FCA cases with multiple defendants, Rule 9(b) requires that a complaint set forth with particularity each defendant's culpable conduct." JA 607 (citing *Apple v. Prudential-Bache Sec., Inc.*, 820 F. Supp. 984, 987 (W.D.N.C. 1992) *aff'd,* 993 F.2d 228 (4th Cir. 1993)). Grouping defendants together "without specification of which defendant committed which wrong" fails to satisfy Rule 9(b). *Arnlund v. Smith*, 210 F. Supp. 2d 755, 760 (E.D. Va. 2002); *see also Juntti v. Prudential-Bache Sec., Inc.*, 993 F.2d 228 (4th Cir. 1993) (unpublished) (noting that "aggregat[ing] . . . defendants without specifically alleging which defendant was responsible for which act" was "indicative of the insufficiently particular character of [a] complaint").

Ahumada failed to sufficiently distinguish among the defendants. In a 41-page complaint spanning 181 paragraphs, the sections addressed to each individual manufacturing defendant include nine paragraphs about Green Bay, six about

International Paper, ten about Smurfit Stone, and six about Weyerhaeuser.  By comparison, "Manufacturing Defendants" are lumped together generically no less than 46 times.  In fact, Ahumada's bravest allegations are framed in terms of "the Manufacturing Defendants," who, according to the complaint: collaborated with NCED to provide it with false bills for raw sheets, SAC ¶ 117; JA 254; billed NCED at a high price and then provided rebates, SAC ¶ 118; JA 254; stamped their boxes with NCED's box manufacturing certificate, SAC ¶ 116; JA 254; and received tours of the NCED facility, SAC ¶ 73, 78; JA 243-44.

Examining the few allegations that specify actions by individual Manufacturing Defendants reveals their superficiality.  In the allegations against Green Bay, there is no claim that Green Bay made a false invoice of any kind, either in price or product description, or ever paid any rebates. In fact, there are no specific allegations against Green Bay about bills at all—much less specifics such as *what* bills, exactly when, what they looked like, and who authorized or sent them.  In fact, the Second Amended Complaint does not even allege that Green Bay placed NCED's box stamp on the boxes it produced.  SAC ¶¶ 125-33; JA 256-57.

Nor is there any specific allegation that International Paper did any improper billing; in fact, the sole reference to International Paper's bills concedes that the bills accurately were for "complete GSA boxes," and related to bills sent in the fall

43

of 2004, after Ahumada had left NCED.  SAC ¶ 137; JA 258.  Further, Ahumada never alleges that any specific International Paper employee ever received a tour of the NCED facility.

Nor is there any specific allegation that Smurfit Stone provided NCED with inflated bids or false invoices, or paid rebates to NCED. In fact, the allegations specific to Smurfit Stone concede that "when [Ahumada] was working for NCED, it did not do much business with Smurfit Stone."  SAC ¶ 140; JA 259.  The allegations specific to Smurfit Stone also concede that when Ahumada told Smurfit Stone employees of the problems at NCED, they brushed him off based on NCED's superior contacts in Washington.  SAC ¶ 146; JA 260.  That exchange itself appears to demonstrate that Smurfit Stone was unpersuaded by Ahumada's claims of wrongdoing and never understood NCED's fraud.

Against Weyerhaeuser, Ahumada's allegation about rebates or bills listing raw materials when boxes were being made also fall short under Rule 9(b).  The allegations fail to identify any particular false invoices, their timing, or their contents or amounts.  *Cf. Godfrey*, 360 F. App'x at 411 (affirming a dismissal under Rule 9(b), noting that "the complaint does not allege the specifics of *anything*—the terms of the subcontracts, the amounts claims by the subcontractors on the invoice, or the amounts that should have been claimed" on each invoice).

As to NISH, Ahumada's complaint is similarly deficient. For example, Ahumada alleges that because NISH "toured the entire NCED plant" on unspecified dates "from approximately 1999 through at least 2006," and could conceivably "see from their own direct observations" that NCED was not in compliance with JWOD, NISH "knowingly" collaborated with NCED and Jones to present false claims to the government. SAC ¶¶ 72-74, 78; JA 243-44. But the complaint does not state who from NISH participated in these tours, when they occurred or, crucially, how NISH, NCED and Jones "collaborated." Then, from his unsubstantiated "collaboration" assertion, Ahumada made another, concluding that NISH signed 404 Forms "even though NISH knew . . . that NCED did not employ . . . the number of severely disabled employees required under JWOD." SAC ¶ 104, 105; JA 250-51. However, Ahumada provides no information regarding who from NISH signed the 404 Forms, when they were signed, how many were signed, or any other details supporting his conclusion that NISH "knew" of NCED's non-compliance when it signed them.

None of the remaining defendants could build a coherent defense to such broad and generic allegations. Rule 9(b) exists precisely to avoid the kind of "interesting-theory-but-hardly-any-facts" pleading that Ahumada has pursued in this case. *See, e.g.*, *Godfrey*, 360 F. App'x at 411. "[A]dher[ing] firmly to the

strictures of Rule 9(b)," *Takeda*, 707 F.3d at 456, compels affirmance of the District Court's ruling.

### C.    The Second Amended Complaint Cannot Survive Rule 12(b)(6).

To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must do two things:  (i) plead every element of every claim against every defendant; and (ii) allege sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Factual allegations, though assumed true, still must "be enough to raise a right to relief above the speculative level." *Id.* at 555.  "Facts that are 'merely consistent with' liability do not establish a plausible claim to relief." *Takeda*, 707 F.3d at 455 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The Court need not accept "legal conclusions couched as facts" or "unwarranted inferences." *Id.* at 455.

Consistent with his failure to plead with the requisite particularity under Rule 9(b), Ahumada also failed to plead every element of his claims, and failed to plead plausible claims against any remaining defendant.

### 1.    Ahumada failed to plead the element of materiality for any claim or against any defendant.

To state an FCA violation, a relator must allege that false representations were "material" to the government's decision to pay claims. *Harrison I*, 176 F.3d at 785 ("Liability under each of the provisions of the False Claims Act is subject to the further . . . requirement that the false statement or claim be material.").

Additionally, when a relator claims a FCA violation based on a defendant's certification of compliance with a government program, there is a "heightened materiality requirement: the government must have conditioned payment of the claim upon certification of compliance with the provision of the statute, regulation, or contract at issue." *Id.* at 793.   Therefore, Ahumada needed to plead that using, and certifying the use of, 75 percent severely disabled labor were prerequisites to actually getting paid for supplying the government with various goods.  Ahumada failed to do that, even in his Second Amended Complaint.

> **a.    Even if the Fourth Circuit would recognize an implied certification theory of liability under the FCA, Ahumada never alleged that payments from the government were conditioned on certifying JWOD compliance.**

Ahumada does not allege that NCED's invoices *expressly* certified that it complied with JWOD.  Instead, Ahumada alleges that in seeking payment from the government, NCED "directly or indirectly" confirmed that it was in compliance. SAC ¶ 156; JA 262.  This is an *implied* false certification theory of liability, under which "the submission of a claim for payment constitutes an 'implicit certification' that the contractor has fully performed the relevant portion of the contract." *United States ex rel. Carter v. Halliburton Co.*, No. 1:08cv1162, 2009 WL 2240331, at *12 (E.D. Va. July 23, 2009) (alterations and citation omitted).

The Fourth Circuit has never accepted the implied certification theory of liability, and has expressed doubts about its viability. *Harrison I*, 176 F.3d at 786-87 & n.8. Regardless, most "circuits that have allowed implied certification claims have limited recovery to instances where the contractor's certification of compliance with the contract was a prerequisite to payment under the contract." *Carter,* 2009 WL 2240331, at *13 (citing *United States ex rel. Quinn v. Omnicare Inc.,* 382 F.3d 432, 443 (3d Cir. 2004) and *United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.,* 241 F.3d 1372, 1376 (D.C. Cir. 2000) (collecting cases); *see also United States ex rel. Mikes v. Straus*, 274 F.3d 687, 700 (2d Cir. 2001) ("[I]mplied false certification is appropriately applied only when the underlying statute or regulation upon which the plaintiff relies *expressly* states the provider must comply in order to be paid.").

The Fourth Circuit appears to have agreed that implied false certification theory can work only when certification is a direct prerequisite to being paid. In *Harrison I*, the Court stated that for any FCA certification claim to succeed, "the government must have conditioned payment of the claim upon certification of compliance with the provision of the statute, regulation, or contract at issue," and rejected a certification claim when the relator had failed to allege that the implied certifications were "in any way related to, let alone prerequisites for, receiving

continued funding." *Harrison I*, 176 F.3d at 793; *accord United States ex rel. Hererra v. Danka Office Imaging Co*., 91 F. App'x 862, 865 (4th Cir. 2004).

Here, Ahumada never alleged either that compliance with the direct labor requirement or that disclosing rebates was a prerequisite to NCED getting paid by the government.  Consequently, he did not allege materiality against any of the remaining defendants.

### b. Compliance with the direct labor requirement was not, in fact, a condition of payment.

Even beyond Ahumada's failure to *plead* materiality, applicable law shows the alleged false representations in this case were not material.  The JWOD regulations reflect that the direct labor requirement is *not* a condition of payment under a JWOD contract, but rather a condition of participation in the JWOD Program.  The distinction is significant.  "Where a [company] participates in a certain government program in order to perform the services for which payments are eventually made . . . courts are careful to distinguish between conditions of program *participation* and conditions of *payment*."  *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1220 (10th Cir. 2008); *see also Mikes*, 274 F.3d at 701-02.  For example, in *United States ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 799 (8th Cir. 2011), the Eighth Circuit held that the relator failed to allege materiality where the purportedly false certifications were

49

conditions of participation—as opposed to conditions of payment—in a federal student loan program.

Here, using at least 75 percent severely disabled labor in the aggregate during a fiscal year is a condition of continued eligibility for the JWOD Program. 41 U.S.C. § 48b(4)(C) (2006); 41 C.F.R. § 51-4.3(a) (2006). But nothing in the statute conditions payment of a claim on compliance. To the contrary, if a nonprofit agency violates JWOD regulations, it is given the opportunity to correct its violations before it faces the possibility of termination from the program. 41 C.F.R. § 51-4.5(b) (2006); *see also* JA 120-21 (describing probationary procedures). Nowhere do the regulations suggest that government agencies participating in the JWOD Program will deny payment based on a violation of the direct labor requirement. In fact, in this case, when NCED's use of a mere 8 percent severely disabled labor came to light in early 2006, the Committee did not stop payments to NCED or, as NISH recommended, expel it from the JWOD Program, but instead asked NCED to revamp its operations and return to compliance. JA 225-26.

### 2. Ahumada failed to plausibly allege scienter for any count against any of the Manufacturing Defendants.

Scienter is an element of all FCA claims. For each count, Ahumada was required to plausibly allege that each defendant acted "knowingly" as part of

NCED's fraudulent scheme.[15]  *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 917 (4th Cir. 2003).  Stated simply, the FCA is "a fraud prevention statute."  *United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 728 (4th Cir. 2010).  Yet even under Ahumada's theory of this case, none of the Manufacturing Defendants directly defrauded the government by filing false claims for payment.  Appellant's Br. 37.  Therefore, Ahumada can state a claim under the FCA only if he sufficiently alleged that the Manufacturing Defendants "knowingly" participated in NCED's fraud.  Because he did not do so, the District Court properly rejected his Second Amended Complaint as to those defendants.

          **a.**    **It is wildly implausible that any manufacturer could have pieced together NCED's fraud simply by selling products to NCED.**

As a general matter, it would have been nearly impossible for any one of the Manufacturing Defendants to piece together NCED's fraud simply because NCED was placing sizeable orders for completely-built cardboard products.  NCED was a huge nonprofit, with thousands of employees and a multitude of JWOD contracts for a slew of different commodities, ranging from military clothing to boxes.  SAC ¶ 25; JA 234.  At the same time, the JWOD Program's direct labor requirement did

---

[15] For a defendant to act "knowingly" with regard to the false statements or claims, he must have actual knowledge of the untruth, or at least recklessly disregard the truth or falsity of the information.  31 U.S.C. § 3729(b) (2006).

not apply on a commodity-by-commodity or contract-by-contract basis, but rather to NCED's *aggregate* annual labor, regardless of what commodities it made. 41 U.S.C. § 48b(4)(C) (2006); 41 C.F.R. § 51-1.3 (2006). So, the manufacturers could theoretically produce tremendous numbers of partially-built, or even entirely built, boxes for NCED during a given year without any JWOD violations occurring, much less violations so obvious that they would have been apparent to NCED's ordinary suppliers. Moreover, Ahumada does not allege that the manufacturers were aware of each other's contracts. Therefore, given the facts as pled, it would be impossible for any single manufacturer to accurately assess whether NCED was JWOD-compliant overall, regardless of what orders NCED was placing with any individual company.

### b.    Ahumada cannot plausibly allege scienter based on what he told the Manufacturing Defendants.

Ahumada did allege that he personally informed employees of Green Bay, International Paper, Smurfit Stone, and Weyerhaeuser of NCED's failure to comply with JWOD. However, he failed to specifically allege that any of the manufacturers—all for-profit companies without any other experience with JWOD nonprofits—properly understood the actual requirements of the JWOD Program that NCED was violating. In fact, Ahumada has demonstrated that he himself did not fully understand JWOD's direct labor requirement.

52

The direct labor requirement does not, as Ahumada seemed to believe, apply on a contract-by-contract or commodity-by-commodity basis. *Cf.* FAC ¶ 8, 43, 44; JA 51, 59; *see also* SAC ¶ 66; JA 242 (claiming "contracts that were awarded based on compliance with a JWOD requirement that 75% of the direct labor in manufacturing *the garments* would be performed by individuals with severe disabilities") (emphasis added); *id.* at ¶ 77; JA 244 (same phrasing for "manufacturing the containers"); *id.* at ¶ 126; JA 256 ("Relator told Mr. Sharratt that the boxes needed to be made by disabled workers"). Rather, the direct labor requirement applies only to the aggregate annual direct labor performed by the nonprofit. 41 U.S.C. § 48b(4)(C) (2006); 41 C.F.R. § 51-1.3 (2006). The fact that Ahumada alleged that he offered legally incorrect commentary on the JWOD Program and its requirements to the manufacturers does not create a plausible inference of their knowledge of NCED's noncompliance.

That is particularly true because, as Ahumada admits, he leveled those accusations only after NCED had terminated his employment. In the case of Green Bay specifically, Ahumada claimed illegal behavior by NCED as part of a pitch for his own business venture. SAC ¶ 127; JA 256; ¶ 145; JA 260. In other words, the manufacturers heard dubious JWOD-related allegations from a disgruntled and self-interested former NCED employee of six months. That is not the sort of

allegation that leads a functional for-profit business to end its relationship with a significant customer like NCED.

### c.    Ahumada cannot plausibly allege scienter based on tours of NCED.

Ahumada also alleged that each of the Manufacturing Defendants got tours of NCED's facility.   He alleged that those tours should have alerted the manufacturers that NCED was failing to use 75 percent severely disabled labor on its contracts.  SAC ¶ 123; JA 255.

Ahumada provides no detail about any of the tours given to any of the remaining defendants.[16]   However, the sole paragraph in the Second Amended Complaint that describes *any* tour in any detail concedes that some "very low functioning disabled employees" were visible in the tote section.  SAC ¶ 69; JA 242.  Further, it is inaccurate and insulting to disabled individuals to assume that *every* disabled worker could be readily identified as such by a tourist in the plant. "Severely disabled" is defined by statute as being "under a physical or mental disability" that "constitutes a substantial handicap to employment and is of a nature that prevents the individual from currently engaging in normal competitive employment."  41 U.S.C. § 8501(8).  That definition naturally includes individuals with internal or psychological health problems.  Therefore, between the fact that

---

[16] Ahumada generally alleged "tours" by several defendants' employees and a "visit" by a Smurfit Stone employee, but did not allege in any detail what was seen.  SAC ¶¶ 125, 141, 151; JA 256, 259, 261.

many disabled people cannot possibly be identified just by looking at them, and Ahumada's admission that some visibly disabled people did work at the plant, it is far-fetched to infer that the Manufacturing Defendants should have understood that NCED was not employing 75 percent severely disabled workers simply from a tour.

### d. Ahumada cannot plausibly allege scienter based on box stamps and rebates.

Nor do box stamps and rebates create a plausible inference of knowing participation in fraud. Ahumada alleged that the Manufacturing Defendants must have been "knowingly" involved in NCED's scheme because when they produced boxes for NCED, they stamped NCED's box manufacturing certificate on them. SAC ¶¶ 116, 119, 121; JA 254-55. But, as one of the news articles cited in the Second Amended Complaint states, it is "customary in a subcontracting arrangement" for the subcontractor to stamp the boxes in accord with the contractor's wishes, and that action is routinely taken without knowing "the ins and outs of every customer's contracts and subcontracts." JA 206; *see also* SAC ¶ 119; JA 254. Indeed, the Smurfit Stone employee interviewed for that article—published eighteen months before any of the current defendants were sued—added that Smurfit Stone did not know "anything about" NCED's special direct-labor rules, and called NCED "a customer, no different than any other customer." JA 206.

Ahumada also alleged that the arrangement with NCED called for the manufacturers to charge a higher price for cardboard and boxes up front, then refund part of that money as a rebate at the end of each year or month. SAC ¶ 122; JA 255. Ahumada did not allege that the rebates themselves were improper. Rather, he alleged that NCED fraudulently failed to disclose those rebates to the government. But Ahumada did not allege any facts whatsoever suggesting that any of the manufacturers knew whether or not NCED disclosed the rebates to the government, nor did he allege that they knew NCED was *obligated* to report such rebates. The bare allegation that rebates were given says nothing about the manufacturers' awareness of NCED's scheme.

In fact, under the governing regulations, it is unclear whether NCED *was* required to report rebates to the government. Dist. Ct. Dkt. 145, 11-13. It would only have needed to do so if prices for the boxes were set based on cost realism or cost analysis, and that is not the preferred method for price-setting by the Committee. Dist. Ct. Dkt. 145-2; 48 C.F.R. §§ 15.403-1(a)(2-4); (b)(1-2) (2006). For his part, Ahumada has made only conclusory-at-best allegations about the establishment of relevant prices and NCED's obligations to report the rebates. SAC ¶¶ 84-88; JA 246. He has not specifically alleged why NCED was obligated to tell the government about them.

56

Simply put, it is well short of plausible that inaccurate legal commentary from a disgruntled ex-NCED employee of six months, combined with a building tour, would have adequately alerted a manufacturer that NCED was using it for an illegal scheme.  Nor does the use of box stamps and rebates (both common industry practices) indicate that the manufacturers, none of whom is alleged to have benefited from NCED's scheme, were knowing participants.  At best, these facts are "merely consistent with liability," *Takeda*, 707 F.3d at 455, and do not "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Scienter is inadequately pleaded.

### 3.    Ahumada failed to plausibly plead the elements of a conspiracy against any remaining defendant (Count III).

Title 31, section 3729(a)(3) (2006) prohibits "conspir[ing] to defraud the Government by getting a false or fraudulent claim allowed or paid."  To adequately plead an FCA conspiracy under § 3729(a)(3), a relator must plausibly allege that the defendants "intended to defraud the government" and "agreed that the false record or statement would have a material effect on the Government's decision to pay the false or fraudulent claim." *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672-73 (2008); *see also Vuyyuru*, 555 F.3d at 349. Ahumada has failed to plead these elements as to any of the remaining defendants.

First, the conspiracy count fails simply because Ahumada has not sufficiently pleaded a violation of the other FCA provisions.  *See, e.g.*, *Vigil*, 639

F.3d at 801 ("Because the Complaint fails to state claims under sections 3729(a)(1) and (2), it likewise fails to state an actionable conspiracy claim under § 3729(a)(3)."). In other words, because Ahumada has not pled materiality, he cannot adequately plead that the defendants *agreed* their actions would be material to the government's payment decisions. *Allison Engine*, 553 U.S. at 672-73. Likewise, Ahumada's failure to plausibly plead "knowing" participation in the fraud renders him incapable of adequately pleading an "intent to defraud." *Id.* at 671 n.2.

Second, Ahumada has not even *attempted* to argue that his Second Amended Complaint meets the rigorous *Allison Engine* standard for pleading conspiracies. Instead, he erroneously asserts that the 2009 amendments to the FCA make it "no longer necessary" to show intent to defraud.[17] Appellant's Br. 44. Naturally, then, Ahumada pleaded no specific facts regarding the relationship among the defendants, or between specific employees of any defendant and NCED, that would plausibly support a conspiratorial meeting of the minds that would meet the high bar set by *Allison Engine* (or, for that matter, the newer standard either). Instead, Ahumada relied on repeated, conclusory assertions that the manufacturers "conspired" with NCED to get the government to pay false claims. SAC ¶¶ 9, 11,

---

[17] As explained *supra*, the FCA amendments to the FCA's conspiracy provision did not become effective until 2009, well after the conduct alleged here. FERA, Pub. L. No. 111-21, § 4(f), 123 Stat. 1617, 1625 (2009) (applying amendments only "to conduct on or after the date of enactment").

15, 63, 93, 98, 122, 165; JA 230-31, 241, 248-49, 255, 264.  He does the same as to NISH (and makes no allegation that NISH conspired or even had any relationship with the Manufacturing Defendants).  SAC ¶¶ 112, 115, 163, 178; JA 253-54, 264, 266.  *See Twombly*, 550 U.S. at 557 ("[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").

### 4.    Ahumada has abandoned his "reverse" false claim count in Count IV.

Ahumada fails to defend his reverse false claim allegations, or to contend specifically that the District Court erred in dismissing Count IV.  His brief does not provide "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies."  Fed. R. App. P. 28(a)(9)(A); *Mayfield v. NASCAR*, 674 F.3d 369, 376-77 (4th Cir. 2012) (failure to brief an issue abandons it).  Ahumada's brief never so much as cites the statute on which Count IV was based.  This count is abandoned.

Further, the allegations in the Second Amended Complaint simply do not describe a reverse false claim setup under 31 U.S.C. § 3729(a)(7) (2006).  None of the Manufacturing Defendants—Count IV does not involve NISH[18]—ever had any obligation to pay the government.  Because the overall scheme alleged here

---

[18] Although the heading of Count IV identifies "All Defendants," the specific allegations refer only to a purported rebate scheme involving NCED and the Manufacturing Defendants—not NISH.  JA 266.

includes no party that had a *preexisting*, before-the-fraud obligation to pay money to the government, there is no reverse false claim. *See, e.g., Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.*, 190 F.3d 729, 742 (6th Cir. 1999) ("[A] plaintiff may not state a reverse false claim unless the pertinent obligation attached *before* the defendant made or used the false record or statement.'" (citation omitted)).

## CONCLUSION

For these reasons, the remaining defendants request that this Court affirm the judgment of the District Court.

Dated: August 22, 2013

Respectfully Submitted,

/s/ _____

Charles William McIntyre, Jr.
Franklin Darley Annand
McGuireWoods, LLP
Suite 400
2001 K Street, NW
Washington, D.C. 20006-1040
Tel: (202) 857-1700
*Counsel for International Paper and Weyerhaeuser Company*

Jeremy S. Byrum
Matthew A. Fitzgerald
McGuireWoods, LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219

Tel: (804) 775-1000
*Counsel for International Paper
and Weyerhaeuser Company*

Seth A. Rosenthal
VENABLE, LLP
575 7th Street, NW,
Washington, D.C. 20004
Tel: (202) 344-4000
*Counsel for NISH*

Michael Wayne Robinson
VENABLE, LLP
Suite 300
8010 Towers Crescent Drive
Tysons Corner, Virginia 22182
Tel: (703) 760-1600
*Counsel for NISH*

John Francis Henault, Jr.
PERKINS COIE, LLP
Suite 600
700 13th Street, NW
Washington, D.C. 20005-2011
Tel: (202) 654-6200
*Counsel for Weyerhaeuser Company*

Lynn F. Jacob
WILLIAMS MULLEN, P.C.
P.O. Box 1320
Richmond, Virginia 23218-1320
Tel: (804) 420-6000
*Counsel for Green Bay
Packaging, Inc.*

Paul Henry Trinchero
Robert Carton Weaver, Jr.
Benjamin J. Lambiotte
GARVEY SCHUBERT BARER
121 SW Morrison Street, 11th Floor

61

Portland, Oregon 97204
Tel: (503) 228-3939
*Counsel for Rocktenn CP, LLC,*
*f/k/a Smurfit Stone Container Corporation*

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

> • This brief contains 13,984 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) because:

> • This brief has been prepared in a proportionally spaced 14-point Times New Roman font using Microsoft Word.

/s/_____
Matthew A. Fitzgerald

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2013, I electronically filed the foregoing

Response Brief of Appellees with the Clerk of this Court using the CM/ECF

System, which will send notice of such filing to the following registered CM/ECF

users:

          Mark C. Rifkin
          Martin E. Restituyo
          WOLF HALDENSTEIN ALDER FREEMAN & HERZ LLP
          270 Madison Avenue
          New York, New York 10016
          Tel: (212) 545-4600
          rifkin@whafh.com
          restituyo@whafh.com

          Victor M. Glasberg
          VICTOR M. GLASBERG & ASSOCIATES
          121 S. Columbus Street
          Alexandria, VA 22314
          Tel: (703) 684.1100
          vmg@robinhoodesq.com

                    /s/_____
                    Matthew A. Fitzgerald